## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## UNITED STATES POSTAL SERVICE, Respondent.

### No. 86–6043.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 13, 1987.

Decided March 2, 1988.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Karen Cordry (argued), Barbara A. Atkin, Washington, D.C., for petitioner.

James A. Friedman (argued), U.S. Postal Service–Office of Labor Law, Washington, D.C., for respondent.

Before MILBURN and RYAN, Circuit Judges, and EDWARDS, Senior Circuit Judge.

RYAN, Circuit Judge.

This case is before the court pursuant to an application of the National Labor Relations Board seeking enforcement of its order requiring two Detroit area facilities of the United States Postal Service to advise the Detroit area division of the American Postal Workers Union whether local union officials had applied for supervisory positions within the Postal Service. The Board adopted the Administrative Law Judge's determination that the Postal Service's refusal to provide such information was a violation of its duty under § 8(a)(1) and (5) of the National Labor Relations Act, to provide the union with relevant information needed by the union to perform its duties as the employees' statutory bargaining representative. The Board also adopted the Administrative Law Judge's determination that the Postal Service's confidentiality concerns did not justify non-disclosure, and that the information sought fell within the purview of the "routine use" exception to the Privacy Act. For the reasons that follow, we direct enforcement of the Board's order.

## I.

In August 1984, the American Postal Workers Union adopted an amendment to the union's constitution which, among other things, provided that applicants for supervisory positions within the Postal Service could not hold union office. This amendment was binding on the Detroit District Area Local of the American Postal Workers Union, the charging party in the proceedings below. Therefore, the union requested the Detroit and Royal Oak Management Sectional Centers (MSC) of the Postal Service to inform the union as to which union officers had applied for supervisory positions.

The Postal Service fills entry level supervisory positions with current employees in accordance with one of three established procedures. The majority of the positions are filled pursuant to the Profile Assessment System for Supervisors (PASS). The PASS system includes the PASS workbook procedure and the PASS application procedure. Additionally, certain positions are filled outside the PASS system through voluntary applications. Under the PASS workbook procedure, through which the majority of the supervisory positions are filled, the Postal Service places each applicant on a roster valid for two years. The other two methods do not involve a roster, but the Postal Service maintains files on employees who have filed applications.

Employees applying for supervisory positions selected through the PASS workbook procedure must fill out a workbook every two years. In the workbook, an employee rates himself on a series of "work elements." Then, the workbook is given to the employee's supervisor who rates the employee in the same manner. Next, the supervisor's superior reviews the workbook and gives a summary review of the employee. Once the workbook is complete, the ratings are compared by computer and any discrepancies are noted. If there are no discrepancies, a composite score is tabulated and the employee is placed on the roster by rank. However, if discrepancies exist, they are resolved by a three-member board consisting of persons not involved in the initial evaluation, and thereafter, the employee is placed on the roster.

When a vacancy occurs in a supervisory position covered by the PASS workbook procedure, the highest ranking individuals on the roster are interviewed by a three-member Promotion Advisory Board, which includes one member from the employee's own installation. Based on the PASS workbooks and employees' personnel files, three candidates are recommended to the selecting official, who will be the successful candidate's immediate supervisor. The selecting official's choice is reviewed by his superior and the head of the installation. However, the selecting official is not required to state the reasons behind his decision unless he rejects all of the candidates.

Positions filled pursuant to the PASS and non-PASS application procedures are post-

ed and, thereafter, employees submit applications and supervisory evaluations. The applications are reviewed by the Promotion Advisory Board which recommends candidates to the selecting supervisor who makes a choice in the same manner as for a position filled pursuant to the PASS workbook procedure. Although no roster is maintained, the Postal Service does maintain a list of the persons applying for these positions.

The union represents Postal Service employees within the Detroit Metropolitan area, which includes the Detroit and Royal Oak MSC's, in contract negotiations and administration. Union shop stewards represent the Postal Service employees in grievance proceedings and have the power to settle the grievance in the initial stages of the proceedings. The union saw the potential for divided loyalty in a union officer who had also applied for a supervisory position within the Postal Service and amended its constitution in 1984 to address this situation. The amendment, in pertinent part, stated:

> That any postal employee who shall voluntarily after August 31, 1984 hold, accept, or *apply* for any managerial, supervisory, EAS or PASS Program position in the Postal Career Service for any period of time ... shall immediately vacate any office held by that member in the National Local, Area Local, District Council, State or Regional Organization ... or any other subordinate body of the APWU.... (emphasis added).

On August 23, 1984, Union President Ivory Tillman sent letters to all the stewards and officers of the union explaining the new amendment, a copy of which was enclosed in each letter. Shortly thereafter, Tillman telephoned Donald Coats, the Director of Employee Labor Relations for the Detroit MSC to inform him of the new amendment and to request information related to compliance. Tillman explained the content of the amendment to Coats, and in response Coats requested that Tillman's information request be made in writing.

In September 1984, Tillman sent letters to Postal officials in the Detroit and Royal Oak MSC's naming the union officers and stewards at each facility and requesting the Postal Service to identify any of those listed who were on the "Supervisory Eligibility Roster". The letters did not mention the amendment to the AWPU's constitution or explain the need for the information. Additionally, Tillman's letters quoted from a decision of the National Labor Relations Board, purported to be in response to a charge filed by "the Dallas APWU Local," to the effect that "the employer's refusal to furnish information to the Union raised Section 8(a)(1) and (5) issues." However, the letter did not name or cite the decision, or explain its relevance.

Gene Cole, the Detroit MSC's Postmaster, responded by letter and refused to provide the union with the information until its relevance to the collective bargaining process was explained. Within the Royal Oak MSC, one postmaster supplied the requested information to the union, and several of the other postmasters referred their requests to the Director of Employee Labor Relations for the Royal Oak MSC, Howard Byrne. Byrne's letter in response stated that the requested information was protected from disclosure by the Privacy Act.

Thereafter, the union filed an unfair labor practices charge with the Board on October 23, 1984, alleging that the Postal Service's failure to identify union officials who had applied for supervisory positions violated § 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5). On March 22, 1985, the union amended its charge in the following manner to clarify its need for the information:

> This information is necessary to fairly represent our members at the collective bargaining table and during contract administration in order to prevent conflicting loyalties. Those officers and stewards of the [union] who are on the register might compromise the rights of employees they represent because of concern for the effect that their activities as stewards or officers would have on the possibility of their promotion. Such stewards and officers are in a conflict of

interest position and a constitutional amendment adopted by the [union] proscribes employees on the management roster from serving as stewards and officers. The [union] needs the requested information to ensure that the constitutional amendment is being adhered to and to ensure that employees are represented by single-minded officials.

The Postal Service still maintained that it was not obligated to provide the information sought. A hearing before the Administrative Law Judge was held on April 8–9, 1985, in which it was determined that the Postal Service's refusal to provide the information violated § 8(a)(1) and (5) of the National Labor Relations Act. The Administrative Law Judge's recommendation that the Postal Service be ordered to furnish the information was adopted by the Board.

## II.

■ Generally, an employer's duty to bargain collectively established in § 8(a)(5) of the National Labor Relations Act[1], obligates it to provide a labor union with relevant information necessary for the proper performance of the union's duties as the employees' bargaining representative. *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303, 99 S.Ct. 1123, 1125, 59 L.Ed.2d 333 (1979); *NLRB v. Acme Indus. Co.*, 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495

(1967); *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). The failure to provide such information constitutes an unfair labor practice in violation of § 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1), (5).[2]

Our standard of review is well-established. The Board's findings of fact must be upheld if they are supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The Board's application of the law to the facts is also reviewed under the substantial evidence standard, and the Board's reasonable inferences may not be displaced on review. *NLRB v. United Ins. Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). Additionally, deference must be given to the Board's determination regarding the employer's duty to provide the requested information to the union. *E.I. DuPont de Nemours & Co. v. NLRB*, 744 F.2d 536, 538 (6th Cir.1984) (per curiam).

■ Turning to the merits, the threshold issue for us to determine is whether the Board correctly determined that the names of union officials who have applied for Postal Service supervisory positions was information *relevant* to the union's representative duties in collective bargaining and grievance proceedings.[3] That remark-

---

1. 29 U.S.C. §§ 151–158.

2. Section 8(a)(5) of the Act states that it shall be an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Section 8(a)(1) of the Act provides that it shall be an unfair labor practice for an employeer "to intefere with, restrain or coerce employees in the exercise of the rights guaranteed in Section 157," specifically "the right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. §§ 158(a)(1), 157. Therefore, a violation of § 8(a)(5) is also a violation of § 8(a)(1). *New Jersey Bell Telephone Co. v. NLRB*, 720 F.2d 789, 791 n. 2 (3rd Cir.1983) (citing *United Steelworkers of America v. NLRB*, 530 F.2d 266, 270 n. 6 (3rd Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 100, 50 L.Ed.2d 100 (1976)).

3. The Postal Service's assertion that the Privacy Act of 1974, 5 U.S.C. § 552a, is a valid defense to the union's informational request, depends solely on whether the information sought is relevant to the union's collective bargaining duties. Thus, this apparently separate issue is but another path to the central relevancy issue. However, this conclusion merits a brief explanation. The Privacy Act prohibits certain "agencies" from disclosing "records" from a "system of records" without prior consent of the individuals to whom the records pertain. 5 U.S.C. § 552a(b). The definition of "agency" includes "any Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government ... or any independent regulatory agency." 5 U.S.C. § 552(e). The Postal Service is an "independent establishment of the executive branch," 39 U.S.C. § 201, and as such is an "agency" subject to the strictures of the Privacy Act. Therefore, unless the records sought fall within an exception to the Privacy Act, the Postal Service justifi-

ably minimal standard merely requires the Board to find a "probability that the desired information [is] *relevant* ... and that it would be *of use* to the union in carrying out its statutory duties and responsibilities". *E.I. DuPont de Nemours & Co.*, 744 F.2d at 538 (quoting *Acme Indus. Co.*, 385 U.S. at 437, 87 S.Ct. at 568) (emphasis added). The union requested the information to enable it to insure that union officials perform their duties with undivided loyalty to the represented employees' interests.

It is clear that employees are entitled to "be represented in collective-bargaining negotiations by individuals who have a single-minded loyalty to their interests." *Nassau & Suffolk Contractors' Ass'n.*, 118 N.L.R.B. 174, 187 (1957). The Supreme Court quoted from relevant legislative history on this issue in *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983):

> The House report [on the National Labor Relations Act] recognized that "no one, whether employer or employee need have as his agent one who is obligated to those on the other side, or one whom, for *any* reason, he does not trust."

*Id.* at 704 n. 9, 103 S.Ct. at 1475 n. 9 (quoting H.R.Rep. No. 245, 80th Cong., 1st Sess. 17 (1947) (emphasis in original)). Likewise, it is clear that once a union member is promoted to a supervisory position, a conflict of interest exists. *Mon River Towing Inc. v. NLRB*, 421 F.2d 1, 8 (3rd Cir. 1969). Accordingly, it was recognized in *National Association of Letter Carriers*, 240 N.L.R.B. 519 (1979), that a union mem-

ber "who accepts a position as a temporary supervisor clearly aligns himself with the interests of management." Additionally, in *Mon River*, "the need to assure the complete devotion of union negotiating teams to employee interests" and the need to prevent "any possibility of abuse," supported the prophylactic measures taken. 421 F.2d at 8.

■ But, the union asserts that the mere application for Postal Service supervisory positions could potentially impair the ability of union officials to represent employees with undivided loyalty. The Board determined that the facts in this case indicate a clear potential for conflict of interest problems, an inference we find to be reasonable, and therefore, one we may not disturb on review. *United Ins. Co.*, 390 U.S. at 260, 88 S.Ct. at 991. The positions of the Postal Service and the union in grievance proceedings and contract negotiations are recognized to be inherently adverse. *Metropolitan Edison Co.*, 460 U.S. at 704, 103 S.Ct. at 1475. However, an applicant's immediate supervisor's opinion is crucial under each of the Postal Service's supervisory application methods applicable in this case. Supervisors' opinions are partially subjective, and therefore, could be influenced by their impressions relating to the employees' actions as a union official. Given the reliance which the supervisory application procedures place on the immediate supervisor's opinion and the opinions of other supervisors, the potential for divided loyalty is not merely speculative. The desire for supervisor approval is likely to affect a union official's ability to represent the em-

ably refused to release them since it is clear that the union did not have the involved individuals' consent. The failure to provide information falling within an exception to the Privacy Act clearly can violate § 8(a)(1) and (5) of the National Labor Relations Act. *Goodyear Atomic Corp.*, 266 N.L.R.B. 890, *enforced*, 738 F.2d 155 (6th Cir.1984) (per curiam). The relevant Privacy Act exception, the "routine use" exception, provides that nonconsensual disclosure is permissible "for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section." 5 U.S.C. § 552a(b)(3). The Postal Service is obligated to annually publish in the Federal Register routine uses of its records pursuant to 5 U.S.C.

§ 552a(e)(4). In 1982, the Postal Service published a notice in the Federal Register describing the following "routine use": "Pursuant to the National Labor Relations Act, records from this system may be furnished to a labor organization upon its request when needed by the organization to perform properly its duties as a collective bargaining representative of postal employees in an appropriate bargaining unit." 47 Fed. Reg. 1,199 (1982). Therefore, it is clear that if the National Labor Relations Act requires the Postal Service to supply the desired information, the unconsented-to disclosure of such would fall within the "routine use" exception to the Privacy Act.

ployees' interests when the positions are adverse. Conflict of interest problems are difficult to detect by their very nature, and thus, necessitate preventative measures. Having determined that the potential for a conflict of interest existed, the Board's determination that the preventative information sought was relevant to the union's duty to provide loyal representation was correct. Clearly, there is a "probability" that this information is relevant and useful to the union in performing its duties. *E.I. DuPont de Nemours & Co.*, 744 F.2d at 538.

### III.

However, the union's right to disclosure of relevant information is not absolute. Legitimate interests of the Postal Service in nondisclosure must also be taken into consideration. *Detroit Edison*, 440 U.S. at 318, 99 S.Ct. at 1132. The Postal Service maintains that its interest in preserving the confidentiality of the information and its exclusive right to select supervisors, outweigh the union's interest in unconsented-to disclosure.

In *Detroit Edison*, the Court determined that the employer's interest in maintaining the confidentiality of "the actual scores received by named employees" on an employment competence test outweighed the union's interest in the non-consensual disclosure of such information. 440 U.S. at 317, 99 S.Ct. at 1132. The Court noted that "[t]he sensitivity of any human being to disclosure of information that may be taken to bear on his or her basic competence is sufficiently well known to be an appropriate subject of judicial notice." *Id.* at 318, 99 S.Ct. at 1133. However, the information sought in this case is not "of the sensitive nature of testing information." *Id.* at 319, 99 S.Ct. at 1133. Rather, the union merely seeks the names of officials who voluntarily applied for supervisory positions. No information regarding the applicant's competence for the applied-for position is sought. Additionally, the information sought will not reveal whom the employer on its own is considering for a position, or who has been considered for position and rejected—information clearly related to competence assessments.

Furthermore, unlike *Detroit Edison*, the Postal Service gave applicants no assurance that the mere fact that they have applied for supervisory positions would be kept confidential. The Administrative Law Judge noted that at no time during the application process did the Postal Service assure applicants that their applications were wholly confidential. In fact, applicants applying through the PASS workbook procedure were informed otherwise. The PASS workbooks contained a statement that "this information may be disclosed to ... a labor organization as required by the [National Labor Relations Act]" pursuant to the "routine use" exception to the Privacy Act. *See*, n. 3, *supra*.

Lastly, the Postal Service asserts that the disclosure of the names of applicants will interfere with its exclusive right under the collective bargaining agreement to select and promote employees to supervisory positions. However, disclosure will merely afford the union information useful to its duty to insure loyal representation through compliance with the APWU's constitutional amendment designed to prevent undivided loyalty. The Postal Service has not contended that the mere adoption of this constitutional amendment constituted an unfair labor practice. The effect of the amendment may well be to force union members to choose between holding union office and contemporaneously applying for supervisory positions. Although this may diminish the number of applicants in the pool for supervisory positions, this potential interference does not outweigh the union's interest in the information in order to ensure loyal representation.

### IV.

Therefore, we find that the union's interest in the disclosure of the information is relevant to its duty to provide loyal representation and is not outweighed by the Postal Service's interest. Accordingly, we GRANT enforcement of the Board's order.