19 F.3d 1433
 148 L.R.R.M. (BNA) 2128
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
I. APPEL CORPORATION d/b/a Somerville Mills, Respondent.
 No. 92-6415.
 United States Court of Appeals, Sixth Circuit.
 March 14, 1994.
 
 1
 Before: KENNEDY and BATCHELDER, Circuit Judges, and WILHOIT, District Judge.*
 
 
 2
 This case is before the court upon application of the National Labor Relations Board (NLRB or "Board") for enforcement of its order issued against I. Appel Corp. (Appel). The Board adopted an administrative law judge's (ALJ) finding that Appel violated sections 8(a)(5) and (1) of the National Labor Relations Act (the "Act"), 29 U.S.C. Sec. 158(a)(5) and Sec. 158(a)(1), by unilaterally imposing changes in the unit employees' terms and conditions of employment and by refusing the Union's request for information relevant to the Union's proper performance of its collective bargaining duties. For the reasons that follow, we order summary enforcement of that portion of the Board's order relating to the unilateral changes in the terms and conditions of employment, and enforcement of the section of the Board's order relating to the request for information.
 
 I.
 
 3
 Appel operates a plant, Somerville Mills, in Somerville, Tennessee where it manufactures ladies undergarments. Appel operates other manufacturing plants in Alamo, Scotts Hill, and Henderson, Tennessee, and Thurmont, Maryland. The employees of the plants in Scotts Hill, Henderson, and Thurmont are represented by the International Ladies Garment Workers Union (ILGWU), and each of those plants has a separate collective bargaining agreement with the ILGWU.
 
 
 4
 On December 5, 1988, the Furniture Workers Division, Local Union 282 of the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, AFL-CIO (the "Union"), was certified as the exclusive bargaining representative of an appropriate unit of Appel's employees at Somerville Mills. The bargaining unit consisted predominately of the production, maintenance, and shipping workers at that plant. From February 1989, through February 1990, Appel engaged in negotiation with the Union. On October 4, 1989, the Union and Appel met for their sixth bargaining session. As of that time the parties had made little progress toward reaching an overall agreement. While the Union had agreed to a few of Appel's proposals on such issues as jury selection, a savings clause, pay day, and some details regarding vacations and holidays, Appel rejected all of the Union's proposals other than union recognition. The parties were unable to agree on wages, hours, overtime, employee categorization, vacations, insurance, grievance and arbitration, strikes and lockouts, seniority, and contract duration. As a result of their inability to agree on a number of issues the Union requested that Appel provide the Union with the collective bargaining agreements between Appel and the ILGWU in force at Appel's other plants. Appel refused to turn over the agreements, disputing the relevance of, and the Union's need for, this information. An ALJ determined that the Union had a right to Appel's collective bargaining agreements, and the Board agreed.
 
 
 5
 The ALJ also found that Appel had violated sections 8(a)(5) and (1), 29 U.S.C. Sec. 158(a)(5) and Sec. 158(a)(1), of the Act by unilaterally imposing stricter standards for disbursement of paychecks and by changing the method of determining compensation for sewing gussets in cotton panties. Finally, the ALJ found that Appel further violated sections 8(a)(5) and (1) by refusing the Union's request for information regarding the Appel's subcontracting of unit work. The Board found that the ALJ's conclusions in each respect were correct.
 
 II.
 
 6
 When an appellate court reviews a Board Decision and Order, "[t]he Board's findings of fact must be upheld if they are supported by substantial evidence on the record considered as a whole," NLRB v. U.S. Postal Serv., 841 F.2d 141, 144 (6th Cir.1988) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). The Board's application of the law to the facts is also reviewed under the substantial evidence standard, and the Board's reasonable inferences may not be displaced on review. NLRB v. Ohio Masonic Home, 892 F.2d 449, 451 (6th Cir.1989). " 'Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision.' " NLRB v. Aquatech, Inc., 926 F.2d 538, 544 (6th Cir.1991) (quoting Emery Realty, Inc. v. NLRB, 863 F.2d 1259, 1262 (6th Cir.1988)). The Board's findings will be set aide only where its "decision is not 'justified by a fair estimate of the worth of the testimony of witnesses' or by the Board's 'informed judgment on matters within its special competence or both.' " Turnbull Cone Baking Co. v. NLRB, 778 F.2d 292, 295 (6th Cir.1985) (quoting Universal Camera, 340 U.S. at 490), cert. denied, 476 U.S. 1159 (1986). Additionally, in suits dealing with union information requests, "deference must be given to the Board's determination regarding the employer's duty to provide the requested information to the union." U.S. Postal, 841 F.2d at 144).
 
 III.
 
 7
 Appel directs its entire argument on appeal to the Board's finding that it violated the Act by not providing its bargaining agreements with the ILGWU to the Union. By not contesting the Board's findings that it committed the above mentioned unfair labor practices, Appel waives any defense it may have regarding these violations. NLRB v. Aquatech, Inc., 926 F.2d at 544; NLRB v. Valley Plaza, Inc., 715 F.2d 237, 240-241 (6th Cir.1983). In Aquatech, this Court held:
 
 
 8
 By failing to address or take issue with the Board's findings and conclusions with regard to the section 8(a)(1) violations ... the company has effectively abandoned the right to object to those determinations. We therefore summarily affirm these findings and enforce the related portion of the order....
 
 
 9
 926 F.2d at 544 (citations omitted). Accordingly, the Board is entitled to summary enforcement of those portions of its order remedying each of the foregoing unfair labor practices except Appel's refusal to produce its other collective bargaining agreements.
 
 IV.
 
 10
 The remaining issue in this case is a narrow one: were the collective bargaining agreements between Appel and the ILGWU relevant and necessary to the Union's ability to bargain effectively with Appel at Somerville Mills? Appel takes the position that the ALJ and Board failed to adopt the proper legal standard in determining the relevancy of the other bargaining agreements. Appel argues that the Union was required to show "some specific nexus" between the nonunit information sought and the Union's statutory bargaining duties and responsibilities.
 
 A. Duty To Furnish Unit Information
 
 11
 An employer's duty to bargain collectively, imposed by Sec. 8(a)(5) of the Act, includes the duty to furnish information relevant to the bargaining representative's proper performance of its collective-bargaining duties. NLRB v. Truitt Mfg. Co., 351 U.S. 149, 153-154 (1956); U.S. Postal, 841 F.2d at 144. The failure of the employer to provide relevant information requested by a union constitutes a violation of sections 8(a)(5) and (1) of the Act regardless of the employer's good or bad faith. Id.
 
 
 12
 When a union seeks information concerning the bargaining unit itself, the information is presumptively relevant and will be ordered disclosed without any showing of relevance by the union unless the employer rebuts the presumption of relevance. E.I. DuPont de Nemours & Co. v. NLRB, 744 F.2d 536 (6th Cir.1984). In this context, information is relevant if there is a "probability that the desired information [is] relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities." DuPont, 744 F.2d at 538 (quoting NLRB v. ACME Indus. Co., 385 U.S. 432, 437 (1967)); General Motors Corp. v. NLRB, 700 F.2d 1083, 1088 (6th Cir.1983).
 
 B. Duty To Furnish Nonunit Information
 
 13
 Where, as here, the union seeks to obtain information that does not relate to the bargaining unit for which it is exclusive representative, the presumption of relevance is lost. DuPont, 744 F.2d at 538. Instead, "the burden is upon the union, and in this case upon the General Counsel, to establish relevance without the benefit of any presumption." Id. (citing NLRB v. Rockwell-Standard Corp., 410 F.2d 953, 957 (6th Cir.1969)).
 
 
 14
 What constitutes a sufficient showing of relevance for nonunit information is, unfortunately, a question with no easy answer. Only one Sixth Circuit case, E.I. DuPont de Nemours & Co., v. NLRB, 744 F.2d 536 (6th Cir.1984), has squarely addressed the issue of an employer's duty to furnish nonunit information. There we stated that "[e]ach case involving this issue 'must turn upon its particular facts,' " id. at 538, and we made it clear that, "a union's demonstration of the relevance of nonunit information must involve something more than the formulation of a merely general theory. Instead, ... courts have required 'some initial, but not overwhelming,' showing by the union that the information actually is important. Id. (quoting San Diego Newspaper Guild v. NLRB, 548 F.2d 863, 869 (9th Cir.1977)).
 
 
 15
 DuPont provides some assistance in determining what constitutes "some initial, but not overwhelming" showing of relevance:
 
 
 16
 Courts have required an initial showing of relevance to prevent needless and expensive explorations by unions into company records. Unions do not have carte blanche to examine employer information merely because the union can articulate some bargaining strategy that will render the information pertinent in some peripheral or theoretical fashion to the bargaining process. "[T]he union's theory of relevance must be reasonably specific; "general avowals of relevance" such as "to bargain intelligently" and similar boilerplate are insufficient."
 
 
 17
 Id. (quoting Soule Glass & Glazing Co. v. NLRB, 652 F.2d 1055, 1099 (1st Cir.1981)). Thus, in order for a Union rightfully to demand nonunit information it must make an initial showing of relevance which is more specific than general avowals that the information will enable it to bargain intelligently.
 
 
 18
 Armed with these general principles, but mindful of the fact that "deference must be given to the Board's determination regarding the employer's duty to provide the requested information to the union," U.S. Postal, 841 F.2d at 144, we now approach the situation at hand. The determinative inquiry is whether the Union met its burden of making an initial showing of relevance that delineated with sufficient specificity its need for the bargaining agreements. The record contains a number of communications between Appel and the Union concerning this request for nonunit information.
 
 
 19
 The Union first requested Appel's bargaining agreements with its other plants at the parties' sixth bargaining session on October 4, 1989. Negotiations between Appel and the Union prior to this session had not proceeded smoothly. According to one Union official "[n]egotiations had been totally unproductive up to that point...." During the October 4 bargaining session, the company chose to introduce a number of new, and arguably regressive, policies including drug-testing, physical examinations, searches of employee's possessions, and elimination of pay for non-working time such as holidays, vacation, and funeral leaves. As a result, the Union requested that Appel provide the Union with the collective bargaining agreements that Appeal had with the union at its other production plants.
 
 
 20
 The Union claims that it initially requested the bargaining agreements because this information would be helpful "[i]n an attempt to try to formulate some proposals that would be acceptable to the company," and because this information was necessary, in light of the new proposals by Appel, in order to determine if these proposals were "in place at his other locations, did they have funeral leave, paid funeral leaves, did they have the drug testing in place, did they have the searching policy in place...." Appel refused to provide the Union access to this information. Lead counsel for Appel reportedly responded to the requests by stating that "it was none of [the Union's] business" and that he would not provide this information "unless he was made" to do so.
 
 
 21
 The Union's next request for the bargaining agreements came in the form of a letter dated October 10, 1989. This letter confirmed that the union wanted to obtain the bargaining agreements between Appel and the ILGWU. Appel responded on October 12, 1989, rejecting the Union's request but stating that "[u]pon a sufficient showing of relevancy for this sweeping request for non-unit information, we will give it consideration."
 
 
 22
 The Union responded in a letter dated October 19, 1989:
 
 
 23
 [P]lease be advised that the union renews its requests for the following reasons:
 
 
 24
 (1) Copies of such agreements will indicate whether the ridiculous demands being made on this union at the Somerville Plant is a matter of corporate policy, that is applied uniformly to all union bargaining units, or whether this union and this unit have been singled out in retaliation to these workers voting for representation in this union in spite of Mr. Katz's threats during organizing campaign never to negotiate a contract with this union, and he would close the plant before he agrees to a contract with this union.
 
 
 25
 (2) On the other hand, these documents could provide the kind of information that maybe [sic] very helpful in helping both parties in our efforts to resolve our differences in good faith, and sign a contract that both parties can live with.
 
 
 26
 On November 10, 1989, Appel wrote to the Union requesting "all contracts between the [Union] and other employers." The letter explained that the contracts were needed "[i]n order that we may intelligently and properly evaluate the union's contract proposals submitted in the negotiations with [Appel]." The letter added that "[c]opies of such agreements will indicate whether the unions' proposals to Somerville Mills are a matter of union policy that is applied uniformly in all union bargaining, or whether Somerville Mills is being treated differently," and that the contracts "would also provide the kind of information that may be very helpful in helping both parties in our efforts to resolve our differences in good faith." The final paragraph of this letter provided, "[t]his request is submitted without prejudice to the company's objection to the relevancy of your October 10, 1989, request to the Company for this same information."
 
 
 27
 On December 1, 1989, the Union forwarded to Appel copies of 19 bargaining agreements between the Union and other employers. On February 20, 1990, the Union presented Appel with a list of twenty of the parties' unresolved bargaining issues and a request that Appel present the Union with a "verbatim" account of how these issues were resolved in Appel's contracts with the ILGWU. The letter advised that the Union would be "willing to give serious consideration" to those contract provisions as a basis for agreement between the parties. Appel again did not provide the contracts.
 
 
 28
 The ALJ analyzed the justifications offered by the Union and concluded that the Union was entitled to an order requiring Appel to produce the collective bargaining agreements from Appel's other plants. Unfortunately, the ALJ's findings are stated in exactly the kind of boilerplate which DuPont forbids:
 
 
 29
 [T]hat the Union's request for [Appel's] contract's at other unionized locations (three contracts at most) was made in good faith, that Respondent knew at all material times why the Union was asking for this information, and that the General Counsel has sustained his burden of showing that such information was relevant and would be of use to the Union in carrying out its statutory duties and responsibilities.
 
 
 30
 However, our review of the record in this case convinces us that it contains substantial evidence to support the Board's conclusion that the Union made a sufficient showing of the specific relevance of the material sought to satisfy the requirements of DuPont.
 
 
 31
 In order to satisfy the initial but not overwhelming threshold of relevancy, the Union needed to assert more than general avowals that the information would help them bargain intelligently. DuPont, 744 F.2d at 538. The Union made it clear that this information would help it to determine whether Appel's unyielding and somewhat antagonistic negotiating was its normal bargaining stance, or whether it was being particularly contentious with this union. The Union also made it known that it would be willing to give the provisions in the requested collective bargaining agreements serious consideration as a basis for arriving at an agreement with Appel in the negotiations at hand.
 
 
 32
 If the Union's justifications for needing the bargaining agreements were the only evidence we could consider, we would find it more difficult to hold that the Union had met its initial burden of identifying with reasonable specificity the relevance of the entire collective bargaining agreements with a different union, covering other plants. However, this Court has specifically held that "[e]ach case involving this issue must turn upon its particular facts." DuPont, 744 F.2d at 538. We find in this case the presence of another factor that confirms the relevancy of the requested information and the Union's need for it.
 
 
 33
 On November 10, 1989, Appel wrote to the Union requesting "all contracts between the [Union] and other employers." Appel thus made it clear that it considered the Union's bargaining agreements helpful in facilitating negotiations. Appel specifically requested copies of the Union's bargaining agreements with other companies, because "[c]opies of such agreements will indicate whether the unions' proposals to Somerville Mills are a matter of union policy that is applied uniformly in all union bargaining, or whether Somerville Mills is being treated differently," and that the contracts "would also provide the kind of information that may be very helpful in helping both parties in our efforts to resolve our differences in good faith."
 
 
 34
 Appel argues that the fact that it requested this information from the Union is irrelevant because of the disclaimer Appel included at the end of its letter.[1] This disclaimer simply stated that Appel's request for information in no way prejudiced its refusal to provide the same information to the Union. However, as the ALJ tactfully stated, Appel "does not appear to be inviting accusations of harassing tactics by averring that this letter from [Appel] to the Union constituted a demand for information which [Appel] knew to be irrelevant to negotiations." And while Appel's taking a "sauce for the goose" position does not relieve the Union of its burden to meet the initial threshold required by DuPont, it is an important factor to be considered when determining the relevance of the entire collective bargaining agreements from Appel's other plants to the Union's ability to bargain effectively with Appel.
 
 
 35
 Appel contends that an order that the Board's decision be enforced would fulfill the dire prophecy of the employer in DuPont, that this "approach will permit unions to discover virtually any information a company possesses merely by fabricating a ... proposal somehow linked to the desired information." DuPont, 744 F.2d at 539, n. 4. But we made it clear there, as we do here, that mere theoretical relevance, or relevance without a showing of good faith and reasonable necessity, will not suffice. Here, the Union justified its request for Appel's other collective bargaining agreements by noting the new and distasteful proposals which Appel had put on the bargaining table, inquiring whether these proposals were standard in Appel's contract negotiations, and making a written offer to consider them seriously on whatever basis they actually were incorporated into those other collective bargaining agreements. The ALJ and the Board both found that the Union's requests were made in good faith. And Appel's own actions in requesting the Union's other agreements lend force to the argument that other collective bargaining agreements were relevant to these negotiations.
 
 
 36
 We think that a caveat is in order here. The facts of this case are unusual, and we caution that our holding is confined to these peculiar facts. The Board should not order enforcement of a request for information, the sole purpose of which is to harass or act as a "fishing expedition," nor would this Court enforce such an order. Neither, however, should an employer that elects to follow the course of action followed by Appel in this case, be surprised to find itself hoist with its own petard.[2]
 
 
 37
 There was a sufficient showing, on the facts of this particular case, that the nonunit information sought was relevant and reasonably necessary to the Union's ability to negotiate effectively. The order of the Board is therefore ENFORCED.
 
 
 
 *
 The Hon. Henry R. Wilhoit, District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 Appel makes much of the fact that it specifically stated that its request to the union was "without prejudice" to the Union's request. We agree that this letter should not be used to prejudice Appel; however, Appel's request is still highly probative on the issue of the relevance of the information requested by the Union. Since Appel chose to make a "mirror image" demand on the Union, we can only conclude that Appel considered this information highly relevant to the bargaining process
 
 
 [2]
 W. Shakespeare, Hamlet, Act III, Scene IV