NORTH GERMANY AREA COUNCIL,
OVERSEAS EDUCATION
ASSOCIATION, Petitioner,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent.

No. 85–1595.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 27, 1986.

Decided Nov. 21, 1986.

Richard J. Hirn, Washington, D.C., for petitioner. Michael Mauer, Washington, D.C., also entered an appearance, for petitioner.

Pamela P. Johnson, Attorney, Federal Labor Relations Authority, with whom Ruth E. Peters, Sol., Steven H. Svartz, Deputy Sol., and William E. Persina, Associate Sol., Federal Labor Relations Authority, Washington, D.C., were on the brief, for respondent.

Before WALD, Chief Judge, and WRIGHT and McGOWAN, Senior Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

In this case, we review an order entered by the Federal Labor Relations Authority ("FLRA" or "Authority") which held that supervisors and management officials are not ordinarily similarly situated employees for the purposes of showing in a grievance the disparity of treatment among unit employees. Because the FLRA has not explained adequately why supervisors' disciplinary sanctions for the same offense as unit employees are not relevant in the unit employee's case, we remand the case to the Authority for further explanation or reconsideration of this issue.

I.

This case arose under the Federal Service Labor-Management Relations Statute ("Statute"), as amended, 5 U.S.C. §§ 7101–7135 (1982 & Supp. II 1984). Petitioner is the North Germany Area Council, Overseas Education Association (the "Union" or "OEA"). Respondent is the Federal Labor Relations Authority. The respondents before the Authority were the Department of Defense Dependents Schools, Germany Region, and Department of Defense Dependents Schools, Washington, D.C. ("DODDS").

The Union is the exclusive collective bargaining representative for a unit comprised of non-supervisory professional school-level personnel employed by DODDS in its Germany region. In June 1983, a bargaining unit employee (the "grievant"), a teacher, received notice of proposed removal from employment based on allegations of having made false statements in documents submitted to DODDS. The grievant obtained representation in that matter from the Union's General Counsel, Michael Mauer.

On July 5, 1983, Mauer wrote to DODDS requesting, "all documents in DODDS' possession relating to disciplinary/adverse actions in this Region against either bargaining unit employees or management, proposed during the last three years on the basis of the alleged making of false statements ... (and) all documents relating to the outcome of the above actions." Joint Appendix at 162–63. Mauer indicated that the information was needed to prepare a reply to the proposed action, as it appeared to the Union that the grievant was "facing disparate treatment for his alleged offenses." *Id.*

In August, 1983, DODDS' Freedom of Information Officer denied Mauer's request, asserting that disclosure would violate the Privacy Act and result in the invasion of the personal privacy of others. On September 14, 1983, the Union filed an unfair labor practice charge, alleging that the refusal to provide the requested information constituted a violation of section 7114(b)(4) of the Statute.

On September 15, 1983, Mauer and grievant met with Dr. Joyce Wilson, Educational Program Administrator, and Kenneth Bumpass, a DODDS Labor Relations Specialist in the Management Employee Relations Branch at the Regional level. At this meeting, Mauer stated that he was unable to fully present a reply to the grievant's proposed removal because Mauer had not received any of the information that the Union had requested. The DODDS representatives advised Mauer to make a second request for the data under the FOIA, asking for a chart of disciplinary actions that

had been proposed and of the final outcome. Mauer refused to make such a request, contending that he was entitled to complete files that would include any evidence that was compiled in the course of management's investigation of alleged infractions, any replies that were submitted by employees of management officials, and any follow-up action that was taken. Mauer indicated that he was not interested in identifying particular individuals at particular schools and had no objection to receiving sanitized documents.

On September 19, 1983, Bumpass informed Mauer that he had learned that there were three instances where disciplinary action had been proposed with respect to management officials. However, it was the agency's position that they were not obligated to furnish information to the Union on management officials, and they would not do so.

On September 29, 1983, Mauer presented, on the grievant's behalf, an oral reply to the agency's notice of proposed removal. At the meeting, Mauer restated his contention that, while he did not object to receiving sanitized documents, he was entitled to complete files. Mauer presented a letter to management's representatives which indicated that reply was being made under protest and a complete presentation on grievant's behalf could not be made without "full knowledge" concerning other similar proposed actions. Mauer contended that he had been supplied only with selected documents from files involving bargaining unit employees at the Regional level and that he had been refused files pertaining to supervisors and unit employees which might be in the possession of the local Civilian Personnel Offices ("CPOs") or others. This letter stated also that Mauer was going to contact the CPOs, requesting all documents regarding disciplinary/adverse actions against DODDS employees or administrators taken or proposed during the past three years for making false statements. Mauer wrote to the CPOs; some did not respond, others indicated that they had no records of the type

requested, and others referred Mauer to the Regional Office or informed him that the information was not releasable.

By letter of October 20, 1983, the grievant was notified that it was the agency's decision to suspend him without pay for fourteen days and to involuntarily transfer him to another school. Thereafter, the Union filed a grievance on the teacher's behalf.

After learning of Mauer's unsuccessful attempts with the CPOs, on December 2, 1983, DODDS Regional Office wrote to all CPOs requesting appropriate case files of teachers charged with making false statements or misrepresentations. By January 1984, all CPOs had responded that no such case files existed in their offices. No attempt was made to obtain similar information for management employees. However, in January of 1984, the Regional Office notified Mauer that, although under no obligation to furnish such information, a search of the Regional Office files disclosed one case involving a supervisory employee charged with fraudulent misrepresentation. Mauer was provided with a three line summary of this case. Joint Appendix at 166.

Upon the filing of an unfair labor practice charge, the General Counsel of the Authority issued a complaint alleging that DODDS had violated sections 7116(a)(1), (5) and (8) of the Statute when it refused to supply the Union with various documents in connection with the grievant's defense. A hearing was held before an Administrative Law Judge ("ALJ") in West Germany. Evidence disclosed at the hearing revealed that two additional unit employees were involved in situations concerning making false statements, but their identity or files were not made known to Mauer. Joint Appendix at 166. Documents concerning one employee were not furnished since the complete file was already in Mauer's possession. The ALJ concluded that the file concerning the other employee was apparently "overlooked" when the files were searched. *Id.* The matter concerning this second unit employee involved, in part, a

manager who was involved in falsifying a document. The ALJ concluded that it appeared that two or three other situations existed involving management employees making false statements. *Id.*

The ALJ found that under section 7114(b)(4) of the Statute, the Union was entitled to receive all the documents requested regarding unit employees, and DODDS' failure to comply fully with this request violated sections 7116(a)(1), (5) and (8) of the Statute. The ALJ found that the data concerning managerial employees was similarly necessary and relevant to require production by DODDS so that the Union could evaluate the data and, if favorable, put the matter before the party who would decide what weight to give evidence of disparity of discipline. Joint Appendix at 169. The ALJ thus concluded that DODDS had violated sections 7116(a)(1), (5) and (8) by its failure to furnish requested data relative to managerial employees. DODDS appealed this decision to the Authority.

On August 19, 1985, the Authority issued its decision and order in *Department of Defense Dependents Schools, Washington, D.C. and Department of Defense Dependents Schools, Germany Region,* 19 FLRA No. 96 (1985). In agreement with the findings and conclusions of the ALJ, the Authority found that the information requested with regard to bargaining unit employees was "necessary" for the Union in its representation of the unit employee under the parties' negotiated grievance procedure. The Authority disagreed, however, with the ALJ's determination that DODDS was obligated to furnish the Union with information concerning discipline given to supervisors or management officials. The Authority concluded that the information requested regarding management officials and supervisors was not shown to have been "necessary" to assist the Union in discharging its responsibilities under the Statute, and therefore dismissed this portion of the complaint. 19 FLRA at 792. It is this aspect of the Authority's decision that the Union now appeals.

## II.

The Federal Service Labor-Management Relations Statute requires an agency "to furnish to the exclusive representative ... upon request and, to the extent not prohibited by law, data—(A) which is normally maintained by the agency in the regular course of business; (B) which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining; and (C) which does not constitute guidance, advice, counsel, or training provided for management officials or supervisors, relating to collective bargaining." 5 U.S.C. section 7114(b)(4). The information sought must be necessary and relevant to assist the representative in discharging its responsibilities under the Statute. *United States Environmental Protection Agency, Health Effects Research Laboratory, Cincinnati, Ohio,* 16 FLRA 52, 54 (1984) (hereinafter *Health Effects Research* ).

The Union request was for data concerning both unit and managerial employees who were involved in situations similar to that of the grievant. The Union conveyed to DODDS that it desired this data to ascertain whether a disparate treatment argument might be made on grievant's behalf. Respondent contends, however, that information regarding management employees is not necessary and relevant to disciplinary actions concerning unit employees. *See* Br. of Respondent at 15–17.

Although the Authority agreed with the ALJ's finding that the data sought as applied to unit employees was necessary and relevant to assist the Union in fulfilling its responsibilities under the Statute, the Authority disagreed with the ALJ's conclusion that the data concerning managerial employees was similarly necessary and relevant. In the Authority's view, "as supervisors and management officials perform different duties and functions, [DODDS] would be governed by different considerations in deciding the degree of discipline appropriate for such persons." 19 FLRA at 792.

The Authority's ruling seems to suggest that the standards of expected behavior for unit employees and managerial employees might differ. But the Authority offers no guidance for determining why, in this case, such standards differ. In support of its holding, the Authority does not cite any FLRA cases which hold that information on falsification by supervisors is irrelevant to the disciplining of unit employees for the same offense.

The Authority's conclusion in the instant case is also in stark contrast to the findings of the ALJ. The ALJ noted that even if disparate treatment between unit employees and managerial employees could be established for similar misconduct, it is for an arbitrator or deciding authority to take this factor into account when assessing what penalty, if any, to impose on the grievant. 19 FLRA at 804. It is generally accepted in arbitration practice that enforcement of rules and assessment of discipline be exercised in a consistent manner unless a reasonable basis exists for the variation. Elkouri & Elkouri, How Arbitration Works, 684–85 (4th ed. 1985).

The ALJ concluded that an arbitrator or deciding authority might ultimately find that, because different standards of conduct apply to unit and management employees, disparity of discipline, if it exists, is not persuasive. 19 FLRA at 804. The underlying information might be sufficiently relevant therefore to require production by DODDS so that the Union can evaluate the data, and if favorable, put the matter before the party who will decide what weight to give evidence of disparity of discipline. *See, e.g., Health Effects Research,* 16 FLRA 52, 54.

Petitioner contends that whether the same standards of discipline apply to the grievant and his supervisors is the ultimate question to be decided by the Arbitrator. Reply Br. of Petitioner at 2. Petitioner argues that the Authority has usurped the Arbitrator's role in concluding that different standards apply. *Id.* In response, the Authority fails to explain what, if any, weight in this particular case is to be as-

signed to evidence that supervisors and unit employees are disciplined disparately. Arbitrators regularly consider such evidence as relevant to determining whether a unit employee has been disciplined for just cause. *See, e.g., Kast Metals Corp.,* 70 LA 278, 283–84 (Roberts, 1978); *Peerless Laundry Co.,* 51 LA 331, 335 (Eaton, 1968); *Potlatch Forests, Inc.,* 51 LA 685, 688 (Williams, 1968); *Lukens Steel Co.,* 42 LA 849, 850 (Crawford, 1964); *Great Atlantic & Pacific Tea Co.,* 39 LA 823, 825 (Turkus, 1962).

While not controlling, the findings and conclusions of the ALJ comport generally with the approach taken by the National Labor Relations Board in similar cases arising under the National Labor Relations Act. *See E.I. Dupont de Nemours v. NLRB,* 744 F.2d 536 (6th Cir.1984). When a union seeks information concerning the bargaining unit, "that information is presumptively relevant and will be ordered disclosed without any showing of relevance by the union unless the employer itself rebuts the presumption." *Id.* at 538. When a union seeks nonunit information, the burden is upon the union to establish relevance without the benefit of any presumption. *Id.* The Board need only find a probability that the information is relevant and useful to the union in carrying out its statutory duties and responsibilities. *Id.*

This Court has ruled similarly in a National Labor Relations Act case, finding that a liberal standard for assessing the relevancy of requested information to a bargainable issue should be employed. *Local 13, Detroit Newspaper Printing and Graphic Communications Union, International Printing and Graphic Communications Union, AFL–CIO v. N.L.R.B.,* 598 F.2d 267, 271 (D.C.Cir.1979). "Any less lenient rule in labor disputes would hamper the bargaining process." *Id.* at 271–72; *see also National Labor Relations Board v. Pfizer, Inc.,* 763 F.2d 887 (7th Cir.1985) (same liberal discovery standard for relevancy).

As Respondent argues, this Court recognizes that private sector analogies to cases arising under the Statute must be undertaken with care. *See Library of Congress v. FLRA,* 699 F.2d 1280, 1281 (D.C.Cir. 1983). Nevertheless, relevant precedent developed under the NLRA is due serious consideration in interpreting the Statute. *Id.* at 1287. This Court cannot conclude that the Authority has discussed adequately why the information requested by the Union is not necessary or relevant, and therefore shielded from disclosure simply because the information concerns employees outside of the Union's bargaining unit. The information requested would seem to meet the liberal standard for assessing the relevancy of the requested information. In fact, evidence disclosed at the hearing before the ALJ revealed two or three other relevant situations involving management employees making false statements. *See* Joint Appendix at 166.

In essence, the Authority concludes here that because supervisors and management officials perform different duties and functions, they are governed by different considerations in deciding the degree of discipline appropriate for such persons. Joint Appendix at 178. In support of this finding, the Authority relies on its decisions in *Social Security Administration and Northeastern Program Service Center,* 18 FLRA No. 66 (1985) (hereinafter *Social Security Administration*) and *Department of the Air Force, Scott Air Force Base, Illinois,* 18 FLRA No. 75 (1985) (hereinafter *Department of the Air Force*).

In *Social Security Administration,* the Authority determined that information regarding leave usage of supervisors would not ordinarily be necessary for the union's performance of its responsibilities to act for and negotiate collective bargaining agreements for all employees in the unit. The Authority concluded in *Social Security Administration* that, because supervisors perform different functions and have different duties from those of unit employees, supervisors and unit employees might be governed by different considerations in deciding whether to grant or deny leave to

personnel. Similarly, in *Department of the Air Force*, the Authority denied the union's request for the work schedules of military employees—employees outside the bargaining unit—to assess complaints of civilian unit employees that management's scheduling of civilian employees was not consistent with its contractual obligations. In both cases, the information requested by the union concerned the work or leave schedules of non-bargaining unit personnel. This information was found to be "not necessary or relevant" because the non-unit personnel were held not similarly situated for the purposes of showing disparate treatment as between unit employees in the administration of grievances.

Unlike the cases cited by the Authority, the instant case involves a ruling by the Authority that the penalty assessed against supervisors in falsification cases is not relevant to determine the proper penalty that should be assessed against a unit employee. The instant case does not involve a comparison of leave or work schedules of unit employees and supervisors. We do not suggest that employees and management officials who perform different duties and functions should never be governed by different considerations in deciding the degree of discipline appropriate. However, for the limited purposes of this case, it is not clear why the Authority concluded that employees and management officials are not similarly situated with regard to the offense of falsification.

Petitioner contends that cases before the United States Merit Systems Protection Board ("MSPB") suggest that agencies must establish consistent reasons for disciplining a particular employee more severely than other employees charged with the same offense. *See, e.g., Curtis Douglas v. Veterans Administration,* 5 M.S.P.B. 313, 332, 5 M.S.P.R. 280, 305 (1981). The MSPB has held in a case similar to the present one—where a fire-fighter who was accused of falsification was disciplined more harshly than other employees—that all federal employees are required to be trustworthy and to maintain the same high standards of integrity required by the mer-

it system principles found in 5 U.S.C. § 2301(b)(4). *Glenn D. Parsons v. Department of the Air Force,* 21 M.S.P.R. 438, 446 (1984).

In the instant case, the Authority contends that the penalty assessed against DODDS supervisors in falsification cases is not necessary nor relevant for determining the penalty to be assessed against a unit employee. However, as the cases before the MSPB suggest, the Authority has not explained adequately why supervisors might be held to a different standard of trust than are unit employees. If anything, supervisors might be held to an even higher standard of conduct because of the greater fiduciary nature of their duties. *See* Br. of Petitioner at 17. Nevertheless, as Respondent points out, the MSPB cases do not establish necessarily that supervisors and unit employees would be considered as similarly situated employees, for purposes in this case of showing disparate treatment in disciplinary actions. Br. of Respondent at 22.

## III.

We cannot comfortably conclude that teachers and their supervisors should be subject to different disciplinary standards for offenses involving dishonesty just because they perform different duties. Respondent points out that section 7123(c) of the Statute provides that judicial review of Authority orders be on the record in accordance with 5 U.S.C. section 706, which in turn requires this Court to set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion...." 5 U.S.C. § 706(2) (1982). This standard requires that a court normally give "considerable deference" to the Authority's interpretation of its enabling legislation. *Bureau of Alcohol, Tobacco and Firearms v. FLRA ("BATF"),* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). In the context of FLRA negotiability decisions, this Court has held that the FLRA's construction of its statute will be upheld if it is "reasonably defensible."

*National Treas. Emp. U. v. FLRA,* 691 F.2d 553, 558–59 (D.C.Cir.1982).

Despite this generally deferential standard, the Supreme Court has cautioned that "while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling Act, they must not 'rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *BATF,* 464 U.S. at 97, 104 S.Ct. at 444 (citations omitted). We cannot conclude that the Authority has supplied a reasoned explanation why the information requested by the Union regarding discipline of non-bargaining unit management officials and supervisors was not necessary to assist the Union in its representation of a unit employee. We therefore remand the case to the Authority for further explanation or reconsideration of this issue.

*It is so ordered.*